JS-6    **O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONIQUE HERNANDEZ, JOSEPH HERNANDEZ, OLIVIA HERNANDEZ, GABRIELLE HERNANDEZ, JOANNA HERNANDEZ, ALEXIS HERNANDEZ, JOSEPH HERNANDEZ JR. AND O.G., a minor by and through her Guardian ad Litem OLIVIA HERNANDEZ,<br><br>                    Plaintiff,<br><br>        v.<br><br>CITY OF BEAUMONT, OFFICER ENOCH CLARK, CORPORAL FRANCISCO VELASQUEZ, JR., CHIEF FRANK COE,<br><br>                    Defendants. | Case No. EDCV 13-00967 DDP (DTBx)<br><br>**ORDER GRANTING THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[SEALED] |

Presently before the court is Third Party Defendant Piexon AG ("Piexon")'s Motion for Summary Judgment.[1]  Having considered the

---

[1] The court notes that Piexon has failed to comply with several of this district's local rules.  Plaintiff's Memorandum in Support of its motion, for example, does not state the factual background for the motion, and instead "incorporates by reference the factual case summary filed in" a separate motion and its separate Statement of Undisputed Material Facts, in what appears to be an attempt to circumvent the page limitations of Local Rule 11-6.  (Mot. at 5.)  Piexon's memorandum also omits the required table of contents and table of authorities.  C.D. Cal. L.R. 11-8.

(continued...)

submissions of the parties and heard oral argument, the court

grants the motion and adopts the following Order.

**I.   Background[2]**

In 2012, City of Beaumont Officer Enoch Clark ("Clark")

effected a traffic stop of Monique Hernandez.  In the course of the

ensuing interaction between Clark and Hernandez, Clark shot

Hernandez with a JPX Jet Protector pepper spray gun ("the JPX")

from a distance of less than one foot, in violation of the JPX

device's five-foot minimum safety distance.  The parties dispute

whether Clark shot Hernandez in the face or in the side of the

head.  Hernandez was rendered permanently blind as a result of

Clark's use of the JPX device.

The Beaumont Police Department ("BPD") determined that Clark's

use of the JPX was an unreasonable and excessive use of force.

(SOF 7-8.)  As a result, Clark was fired from the BPD.  (SOF 9.)

Following a criminal investigation, Clark was indicted for felony

assault by a public officer, assault with a stun gun/Taser, use of

force to inflict injury, and assault with a deadly weapon.  (SOF

10.)

Hernandez and her family filed suit in this court against

Third Party Plaintiff the City of Beaumont ("the City"), Clark, and

_____

[1](...continued)
Although Piexon's Reply acknowledges these deficiencies and
represents that it will file a supplement correcting them, Piexon
has not done so.  Piexon's Notice of Motion also fails to include a
certification regarding the conference of counsel, in violation of
Local Rule 7-3.

[2] The court's recitation of the facts is drawn from Piexon's
Separate Statement ("SOF") and Third Party Plaintiff City of
Beaumont's Statement of Genuine Disputes of Material Fact "SGD")
(Dkt. 242.)

other BPD officers.  (SOF 13.)  The City filed a third-party
complaint against Piexon, the designer and manufacturer of the JPX,
alleging causes of action for negligence, misrepresentation, strict
liability, failure to warn, breach of warranties, indemnification,
contribution, apportionment, and declaratory relief.  The City's
complaint also names as defendants the distributor of the JPX,
Defendant IBS Sigma, Inc., as well as IBS Sigma agent and sales
manager Defendant Bart Bacolini.  Bacolini sold the JPX to the City
and provided written training materials and live instruction to the
City's police department.  (City Complaint, ¶ 33.)

Hernandez, Clark, the City, and other police officer
defendants entered into a good faith settlement of Hernandez's case
for $18.5 million.  (Dkt. 100; SOF 14.)  The City proceeded with
its claims against Third Party Defendants Piexon, IBS Sigma, and
Bacolini.[3]  Piexon now moves for Summary Judgment.

**II.  Legal Standard**

Summary judgment is appropriate where the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show "that there is no
genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party
seeking summary judgment bears the initial burden of informing the
court of the basis for its motion and of identifying those portions
of the pleadings and discovery responses that demonstrate the
absence of a genuine issue of material fact.  See Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from

---

[3] IBS Sigma has not yet appeared.  It is unclear whether it has been served with the Third Party Complaint.

1  the evidence must be drawn in favor of the nonmoving party. See
2  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).  If the
3  moving party does not bear the burden of proof at trial, it is
4  entitled to summary judgment if it can demonstrate that "there is
5  an absence of evidence to support the nonmoving party's case."
6  Celotex, 477 U.S. at 323.

7        Once the moving party meets its burden, the burden shifts to
8  the nonmoving party opposing the motion, who must "set forth
9  specific facts showing that there is a genuine issue for trial."
10  Anderson, 477 U.S. at 256.  Summary judgment is warranted if a
11  party "fails to make a showing sufficient to establish the
12  existence of an element essential to that party's case, and on
13  which that party will bear the burden of proof at trial." Celotex,
14  477 U.S. at 322.  A genuine issue exists if "the evidence is such
15  that a reasonable jury could return a verdict for the nonmoving
16  party," and material facts are those "that might affect the outcome
17  of the suit under the governing law." Anderson, 477 U.S. at 248.
18  There is no genuine issue of fact "[w]here the record taken as a
19  whole could not lead a rational trier of fact to find for the
20  nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio
21  Corp., 475 U.S. 574, 587 (1986).

22        It is not the court's task "to scour the record in search of a
23  genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275,
24  1278 (9th Cir.1996).  Counsel has an obligation to lay out their
25  support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d
26  1026, 1031 (9th Cir.2001).  The court "need not examine the entire
27  file for evidence establishing a genuine issue of fact, where the
28

evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

### III. Discussion

#### A.   Warning Claims

##### 1.   Causation

Claims for both strict liability failure to warn and negligent failure to warn require a plaintiff to show that the defendant's failure to warn was a "substantial factor" in causing the plaintiff's injury. See, e.g., Mariscal v. Graco, 52 F. Supp. 3d 973, 988, 991 (N.D. Cal. 2014). "A product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct" that led to the injury. Motus v. Pfizer Inc. (Roerig Div.), 358 F.3d 659, 661 (9th Cir. 2004). "Generally, when a warning is given, but the person to whom the warning is directed does not read the warning, there is no causation." Altman v. HO Sports Co., Inc., 821 F. Supp. 2d 1178 (E.D. Cal. 2011); See also Ramirez v. Plough, Inc. 6 Cal.4th 539, 555 (1993) (finding "no conceivable causal connection" between warning and injury where consumer failed to read product label).

###### a.   Clark's Misuse of the JPX

Piexon argues that its warnings were not a substantial factor in causing Hernandez's injuries because Clark not only knowingly disregarded the warnings, but would have disregarded any warnings regardless of their content.   Piexon contends that there is no evidence that Clark read, let alone heeded, Piexon's warnings. Indeed, the City does not dispute that Beaumont Police Officer Matthew Gepford, who trained Clark in the use of the JPX, never gave Clark the JPX safety manual or told Clark where to find the

manual.  (SOF 56; Declaration of John W. Tait Exs. L, P at 127.)
Thus, Piexon argues, regardless of the adequacy of the warnings
provided, those warnings could not have been a substantial factor
in Clark's use of the JPX.

Piexon also cites to statements Clark made during the course
of two separate interviews.  One of the interviews, conducted by
private investigator Chuck Thomas on April 17, 2012, occurred as
part of the BPD's administrative investigation.  (Declaration of
John Tait, Ex. E at 2975-76.)  Clark was informed that his failure
to cooperate with the investigation could result in disciplinary
actions, including termination.  (Id.)

The other interview was conducted by the Riverside Sheriff's
Department Special Investigations Bureau, and took place on
February 29, 2012, nearly two months before the administrative
investigation interview.  (Tait Decl., Ex. D at 2607.)
Investigators prefaced the interview by stating to Clark, "[W]e are
criminal investigations' investigators from the Sheriff's Deparment
. . . .  [W]e are not on the Administrative side. [I]f you feel
like you're compelled to talk to us, you're not.  This is strictly
a voluntary statement."  (Id.)

The City objects to the use of Clark's interview statements
and contends that they are inadmissible.  To the extent the City
raises a hearsay objection, the basis for that objection is unclear
to the court, and the objection is overruled.  The City also
appears to take the position that the statements are barred by the
Public Safety Officers Procedural Bill of Rights Act ("POBRA"),
California Government Code § 3300, et seq.  POBRA applies "[w]hen
any public safety officer is under investigation and subjected to

interrogation by his or her commanding officer, or any other member of the employing public safety department, that could lead to punitive action.  Cal. Gov't Code § 3303.  No statement made in the course of such an interrogation "shall be admissible in any subsequent civil proceeding," subject to certain exceptions not relevant here.  Cal. Gov't Code § 3303(f).  This bar applies to the administrative investigation conducted by Chuck Thomas.

POBRA does not apply, however "to an investigation concerned solely and directly with alleged criminal activities."  Cal. Gov't Code § 3303(I); Van Winkle v. County of Ventura, 158 Cal. App. 4th 492, 497 (2007).  County investigators made clear to Clark that they were not present in administrative capacity, that they were conducting a criminal investigation, and that Clark was under no obligation to participate.  Clark's statements during the February 29, 2012 interview are, therefore, admissible.

During the criminal investigation interview, Clark stated that when he used his JPX device on Hernandez, he believed she was trying to get to a weapon, and that the situation was going to escalate "a lot worse to where we may have to use lethal force." (Tait Decl., Ex. D at 2624, 2626.)  Clark further stated that he was terrified, believed that he or his partner would be hurt, and "wasn't thinking about how far away I should be.  How close I should be.  I was thinking about being injured.  I was thinking about my partner being injured or us both . . . losing our lives." (Id. at 2650, 2665.)  Clark repeatedly reiterated that "I wasn't thinking about distance or anything like that.  I was thinking – or I was concerned about my life . . . ."  (Id. at 2677.)  Clark also admitted that "per the manufacturer" of JPX, there were

7

"requirements or restrictions as to how close or far you should be
when you deploy it" of five feet.  (Id. at 2650.)

     Thus, Piexon contends, there is no dispute that it was Clark's
decision to misuse the JPX, rather than any inadequate warning,
that caused the injury to Hernandez and, by extension, the City.
Piexon argues that no matter what the warnings stated or how
forcefully the information was conveyed, Clark would not have read
them, and even if he had, would have ignored them because he
"wasn't thinking about how far away [he] should be."  Clark's fear
of being injured and fear for his life, Piexon suggests, trumped
any concern he had, or might have had, about misusing a JPX device.

     Although the City does not respond to the merits of this
argument directly, Clark's statements alone do not warrant a grant
of summary judgment in Piexon's favor.  First, even crediting
Clark's statements as true, the evidence does not conclusively
establish that Clark would have ignored any possible warning or
training he received.  Portions of his interview suggest that,
despite his fears, he used the JPX device on Herndandez because he
did not want the situation to escalate into one requiring the use
of lethal force.  He made that decision based on the warnings and
training he had received.  Had he received different training or,
for example, a warning that JPX was highly likely to cause
permanent blindness if deployed at a distance of less than one
foot, it is unclear whether Clark would have made the same decision
to deploy his JPX device, even in the heat of the moment.

     Further, and perhaps more fundamentally, Clark's credibility
is very much in doubt.  Given Clark's incentives to lie to avoid
criminal prosecution, Plaintiff could call into question the

veracity of the statements Clark made to Riverside Sheriff's Department special investigators.  Indeed, the fact that Clark was subsequently prosecuted on multiple felony charges suggests that those investigators found him either not credible or unreasonable. Clark's statements, therefore, do not establish beyond dispute that Piexon's warnings, such as they were, were not a substantial factor in Hernandez's injury.

                    b.  Informed Purchaser

     The City's opposition to Piexon's motion focuses on a different argument.  The City asserts that because the warnings conveyed to Bacolini and the City were inadequate, Piexon "failed to provide the City with enough information to make an informed buying decision when it purchased the JPX . . . and failed to provide proper training for its use."  (Opposition at 4:14-16.)  A manufacturer's liability to an end consumer may be extinguished if the manufacturer has given adequate warnings to an intervening party.  Groll v. Shell Oil Co., 148 Cal. App. 3d 444, 448-49 (1983).[4]  The City suggests that the reverse is true, and that Piexon must be held liable if its warnings were inadequate. Although not framed as such, the City appears to make a "but for" argument that "the City could have made different decisions about purchasing or training had the information about the catastrophic injury potential of the JPX been properly conveyed by Pixeon." (Opp. at 5:24-25.)  In other words, the City might never have

_____

     [4] Garza v. Asbestos Corp., Ltd., 161 Cal. App. 4th 651, 661 (2008), cited by the City, distinguishes Groll in the course of affirming a jury verdict in favor of a consumer where there was no evidence that the manufacturer provided adequate warnings.

1  placed the JPX in Clark's hands in the first place if it had been

2  adequately warned.

3      The City's informed purchaser theory is potentially viable.

4  The California Supreme Court has observed that the substantial

5  factor standard "subsumes the 'but for' test while reaching beyond

6  it to satisfactorily address other situations . . . ." Rutherford

7  v. Owens-Illinois, Inc., 16 Cal. 4th 953, 969 (1997).  The court

8  further explained that "[u]ndue emphasis should not be placed on

9  the term "substantial[,]" as the substantial factor test was

10 "formulated to aid plaintiffs as a broader rule of causality than

11 the 'but for' test," and is misused by defendants whose conduct is

12 clearly a "but for" cause of injury.  Id.

13     Piexon counters that the City's informed buyer argument also

14 fails because there is no evidence that the Beaumont Police

15 Department did not receive adequate information, or that any

16 further information would have affected the City's decision to

17 acquire JPX devices.  Piexon asserts that IBS Sigma provided

18 instruction and safety manuals to the BPD.  (SOF 18; Tait Decl. Ex.

19 G.)  It is unclear whether the City disputes this fact, as the City

20 claims that it cannot locate Exhibit G to the Tait Declaration (SGD

21 17) and appears to dispute that Piexon gave training materials to

22 IBS (SGD 23), yet frequently refers to Piexon training materials

23 provided to the City.  Officer Gepford, furthermore, testified that

24 a copy of the JPX safety manual was stored in a filing cabinet

25 inside a sergeant's office.  (Tait Decl., Ex. L.)

26     The City cites primarily to the opinion of its police

27 practices expert, Steve Ijames ("Ijames"), as evidence that the BPD

28 received inadequate information that may have affected the City's

1  purchasing decision.  (Opp. at 4.)  Ijames testified that, although
2  the City should have done its own investigation and "due
3  diligence," police department purchasers of "less-lethal" products
4  such as JPX also "have to heavily rely on the manufacturers or
5  representatives because in theory they would have the most in-depth
6  information about their product."  (Declaration of Matthew T.
7  Racine, Ex. 1 at 46.)  Ijames also criticized some of the training
8  provided to BPD officers.  Ijames reviewed a PowerPoint
9  presentation given to BPD officers and found it "significantly
10  lacking in a key area . . . that specifically validates learning
11  and reinforcement of understanding distance . . . . [T]hat type of
12  issue[] cannot be reduced down to a comment in a presentation."
13  (Id. at 49.)

14      Notably, however, Ijames did not review all of the warning
15  information in the BPD's possession.  The City does not cite, nor
16  has the court found, any analysis of training or safety materials
17  other than the PowerPoint presentation.  It is not clear from the
18  evidence presented which presentation Ijames reviewed.  Piexon
19  claims, and the City does not appear to dispute, that some BPD
20  officers, including Gepford, received a Piexon presentation titled
21  "Law Enforcement Instructor Training Course."  (Tait Decl. Ex. I.;
22  SOF 45)  Ijames appears to have reviewed a separate Piexon "Law
23  Enforcement User Training Course," attached to the Declaration of
24  John Tait at Exhibit J, that Gepford presented to Clark and other
25  BPD officers.  It is clear from Ijames testimony, however, that his
26  analysis was "limited by the four corners of the slides presented.
27  I don't know what sidebar conversations an instructor would have to
28  students[.]"  (Tait Reply Decl., Ex. Z at 49.)  Piexon further

1    represents that Ijames stated, "Clearly, when you look at the

2    PowerPoint it's bullet points, and there's certainly more provided

3    because it would be a 5-minute class if all he did was just click

4    through the screens," although the page Piexon cites is not

5    included in the record.  (Piexon Reply SOF 65.)  Indeed, the

6    training class Gepford led, and which Clark attended, lasted

7    approximately five hours.  (SOF 53.)

8         The only other argument the City advances in support of its

9    informed purchaser theory is that Piexon's warnings "are confusing

10   because they suggest that short range JPX Jet Protector deployment

11   at the secondary targets ['chest, neck, and side of head'] can

12   safely be accomplished [and] Bacolini . . . was taught . . . and

13   then conveyed . . . to City of Beaumont personnel that they could

14   shoot at secondary targets from under five feet."  (Opp. at 5:27-

15   6:5.)  The evidence the City cites, however, does not support this

16   argument.  There is no dispute that both PowerPoint presentations

17   identified the upper chest and neck area and the side of the head

18   as secondary targets.  Neither target area slide, however, makes

19   any suggestion that secondary targets can safely be engaged at

20   distances under five feet.  (Tait Decl., Exs. I, J.)  Nor does the

21   testimony of Piexon's expert, Patricia Robinson, support the City's

22   claim.  Robinson simply agreed that the instructor PowerPoint

23   Bacolini used to instruct BPD officers identified secondary target

24   areas including the chest, neck, and side of head.  (Racine Decl.,

25   Ex. 2 at 61.)  Robinson did not opine, or identify any information

26   suggesting, that Piexon's materials advised that it was safe to

27   engage a secondary target within five feet.  (Id.)

28

1   Bacolini did testify that he discussed with someone named Zac

2   the appropriateness of shooting a subject in the chest at a

3   distance under five feet.[5] (Racine Decl., Ex. 3 at 110.) Bacolini

4   further explained that if a subject was "closer than five feet or

5   1.5 meters you would drop the target from the face to the high

6   chest . . . . [A]s soon as you were comfortable with a five foot

7   distance between the muzzle and the target face area you would hit

8   the primary area by discharging the second shot." (Id. at 111.)

9   There is no evidence that Bacolini ever instructed or believed that

10  it would be safe to shoot someone in the side of the head from a

11  distance under five feet.[6] Even if Bacolini's reference to

12  secondary targets could be interpreted to include the side of the

13  head, despite his emphasis on the chest area, it is unclear how

14  that representation is attributable to Piexon. Bacolini testified

15  that his belief that JPX could be used under some circumstances

16  within 1.5 meters was his personal opinion, that he made clear in

17  his classes, when the subject arose, that it was his personal

18  opinion, and that nothing about that opinion "came from Piexon."

19  (Tait Reply Decl., Ex. W at 207.) No trier of fact could conclude

20  on this record that Piexon's warnings confusingly suggested that it

21  was safe to shoot someone in the head with a JPX at a distance of

22  less than five feet.

23

─────────────

24      [5] Although not addressed by either party, this trainer appears
25  to have been Zac Almeida, who may have been affiliated with IBS
    Sigma. (Tait Decl., Ex. O at 105.)

26      [6] In response to a clarifying question, Bacolini did testify
27  that, regarding the use of JPX on secondary target areas within 1.5
    meters under exigent circumstances, "secondary target area" does
28  not including shooting at someone's eyes. (Tait Reply Decl., Ex. W
    at 205.)

1   Furthermore, the City does not cite any evidence regarding
2   BPD's decision to purchase JPX, including any evidence supporting
3   the centerpiece of the City's theory –that BPD would not have
4   purchased JPX if it had known more information.  Instead, as
5   discussed above, the City points only to Ijames' opinion that the
6   PowerPoint slides were insufficient to warn of the dangers.  But as
7   Ijames himself acknowledged, his review was limited only to the
8   PowerPoint slides themselves.  While those slides alone may have
9   been insufficient to adequately warn BPD, Ijames recognized that
10  other information must have been presented during the 5 hour user
11  training course, not to mention the separate instructor training
12  that Gepford received or the written materials that the BPD
13  possessed.  Other than the unsupported argument regarding secondary
14  targets, discussed above, the City has not presented any evidence
15  that these materials were inadequate.  The City has not shown,
16  therefore, that Piexon did not provide it with sufficient
17  information to make an informed purchasing decision or, therefore,
18  that Piexon's warnings were a substantial factor in the BPD's
19  decision to put a JPX in Clark's hand in the first place.

20              c.   Sophisticated Intermediary Defenses

21                   i.   Sophisticated Intermediaries[7]

22      A manufacturer or supplier may be able to establish a defense
23  to failure to warn claims if it can show "not only that it warned

24

25      [7] Although Piexon initially raised an additional defense that
26  Clark is a sophisticated user, it appears to have abandoned that
    argument on reply.  In any event, Piexon does not cite any evidence
27  that a sophisticated user, as opposed to Plaintiff's expert, knew
    or should have known that JPX would cause blindness if deployed
28  within five feet.  See Johnson v. American Standard, Inc., 43 Cal.
    4th 56, 71 (2008).

or sold to a knowledgeable intermediary, but also that it actually and reasonably relied on the intermediary to convey warnings to end users."  Webb v. Special Elec. Co., Inc., 63 Cal.4th 167, 189 (2016).  An intermediary is sufficiently sophisticated to establish the defense it the buyer "was so knowledgeable about the material supplied that it knew or should have known about the particular danger."  Id. at 188.  Sophisticated intermediary defenses typically will raise jury questions, "unless critical facts establishing reasonableness are undisputed."  Id. at 190.

Piexon argues that IBS Sigma, Bacolini, and the BPD are all sophisticated intermediaries, and that it reasonably relied upon all of them to warn others downstream.  There is no dispute that Bacolini was a certified "master instructor," that he was shown both of the PowerPoint presentations, as well as training videos and training manuals, and had practical experience firing the JPX. Nor is there any dispute that Piexon policies "specifically emphasiz[ed] over and over the 1.5 meter 5 feet [minimum range]" and that Bacolini was instructed that "you had to be careful with soft tissue especially the eyes if you were inside the safe distance." (SOF 38, 40, 41, 42; Tait Decl., Ex. O at 106, 113.) The City's only dispute is that the evidence does not show that Piexon provided this training to IBS Sigma and Bacolini.  (E.g., SGU 23.)  The PowerPoints and written materials referenced throughout Bacolini's testimony and both parties' arguments, however, all bear Piexon's logo on every page or slide.

The City's entire argument in opposition to Piexon's sophisticated intermediary defense spans only a few sentences, and is premised on the assertion that "Bacolini believed – because he

1   was so trained by Piexon – that the side of the head was a

2   legitimate target under 5 feet.  Bacolini informed City[] officers

3   of this truth.  So, even if Bacolini and the City are sophisticated

4   users in other contexts, they were negligently (or intentionally

5   misled) . . . .”  (Opp. at 7.)  The City cites no evidentiary

6   support for this contention.  Furthermore, as discussed above in

7   the context of the City's informed purchaser argument, the City's

8   factual assertion has no basis in the record.  Neither Piexon's

9   training materials nor Bacolini's presentation of those materials

10  stated a “truth” that the JPX could safely be deployed against the

11  side of a person's head from a distance of less than five feet.

12      Thus, no trier of fact could conclude that IBS Sigma, the BPD,

13  or, at the very least, Bacolini, was not a sophisticated

14  intermediary.  Nor is there a dispute that BPD contracted with IBS

15  Sigma and Bacolini to provide training to Gepford, who then

16  conducted a training of his own.  The City does not dispute, let

17  alone refute, Piexon's argument that it reasonably relied upon

18  these intermediaries to pass along warnings to end users.  Piexon

19  has, therefore, established a sophisticated intermediary defense.

20      To summarize, the City has failed to present evidence that the

21  warnings it received were insufficient to allow the City to make an

22  informed purchasing decision, or that any further information would

23  have affected its decision to acquire the JPX and issue it to

24  Officer Clark.  Piexon's warnings were not, therefore, a

25  substantial factor in the harm to Hernandez.  Furthermore, Piexon

26  has adequately established that it reasonably relied upon

27  sophisticated intermediaries to forward its warnings and advisories

28

1  to the City.  Accordingly, Piexon is entitled to summary judgment
2  on the failure to warn claims.
3      B.   Defect Claims
4          1.   Manufacturing Defect
5      A manufacturer may be liable for producing a defective
6  product, defined as a product "that differs from the manufacturer's
7  intended result or from other ostensibly identical units of the
8  same product line." <u>Lucas v. City of Visalia</u>, 726 F.Supp.2d 1149,
9  1154 (E.D. Cal. 2010).  A manufacturing defect must be a
10 substantial factor in causing an injury to qualify as a legal cause
11 of the injury.  <u>Garrett v. Howmedica Osteonics Corp.</u>, 214 Cal. App.
12 4th 173, 190 (2013).
13     Piexon's JPX training materials highlight that the JPX
14 discharges at a speed of 180 meters per second.  The City's
15 Complaint alleges that the JPX rounds provided to BPD varied from
16 the quality of other rounds because they had muzzle velocities
17 ranging from 550 feet per second to 1000 feet per second, faster
18 than the 590 feet per second, or 1.8 m/s, advertised.  (Complaint ¶
19 69.)  Thus, the alleged manufacturing defect at issue is "the
20 extreme variability of cartridge velocity compared to advertised
21 specifications." (Opp. at 7:26-27.)
22     Piexon argues that, even if the JPX did discharge at the speed
23 the City claims, that faster muzzle velocity was not a substantial
24 factor in causing Hernandez's injury because even a discharge at
25 180 m/s would have led to the same result.  (Mot. at 22.)  The
26 City, without any citation to the record, asserts that the
27 cartridges applied a kinetic energy "approach[ing] that of a .40
28 caliber handgun." (Opp. at 8.)  The City does not, however,

1   address Piexon's argument regarding causation.  Even putting aside

2   Piexon's objections regarding the City's expert's analysis of JPX

3   muzzle velocity, there is no medical evidence in the record at all,

4   let alone evidence that a JPX discharged at 180 m/s at a distance

5   of less than one foot would have had any different effect than one

6   discharged at a higher muzzle velocity.  To the contrary, even the

7   City's expert testified that he did not know if Hernandez's

8   injuries would have been any different if the JPX had performed as

9   advertised.  (SGD 63.)

10      Because there is no evidence that "the extreme variability of

11  cartridge velocity" was a substantial factor in the injury to

12  Hernandez, summary judgment is warranted on the City's

13  manufacturing defect claim.

14              2.   Design Defect

15      "A design defect exists when the product is built in

16  accordance with its intended specifications, but the design itself

17  is inherently defective." Mariscal, 52 F. Supp. 3d at 985.  A

18  plaintiff may seek to show a design defect through a "consumer

19  expectation" test or a "risk-benefit" test.  Id.  Although it is

20  unclear which test the City seeks to apply, the court addresses

21  each.

22              i.   Consumer Expectation Test

23      The consumer expectation test allows a plaintiff to show a

24  design defect by proving "that the product failed to perform as

25  safely as an ordinary consumer would expect when used in an

26  intended or reasonably foreseeable manner." Barker v. Lull Eng'g

27  Co., 20 Cal. 3d 413, 432 (1978).  The consumer expectation test is

28  not applicable to every product liability case.  See Chavez v.

1    *Glock, Inc.*, 207 Cal. App. 4th 1283, 1310 (2012).  "The initial

2    determination whether the consumer expectation test is properly

3    applied to a particular case is for the court."  *Id.* at n. 10.  "If

4    the facts permit an inference that the product at issue is one

5    about which consumers may form minimum safety assumptions in the

6    context of a particular accident, then it is enough for a plaintiff

7    . . . to show the circumstances of the accident and the objective

8    features of the product which are relevant to an evaluation of its

9    safety . . . ."  *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th

10   1111, 1120 (2002).  The required showing does not necessarily

11   require expert testimony.  *Id.*; *Mariscal*, 52 F.Supp.3d at 985.

12   "The thrust of the . . . test is that the product must meet the

13   safety expectations of the general public as represented by the

14   ordinary consumer, not the industry or a government agency."  *Soule*

15   *v. Gen. Motors Corp.*, 8 Cal. 4th 548, 563 (1994).

16       "The consumer expectations test is reserved for cases in which

17   the *everyday experience* of the product's users permits a conclusion

18   that the product's design violated *minimum* safety assumptions, and

19   is thus defective *regardless of expert opinion about the merits of*

20   *the design.*"  *Id.* (emphases original).  "[A]ppropriate use of the

21   consumer expectations test is not necessarily foreclosed simply

22   because the product at issue is only in specialized use, so that

23   the general public may not be familiar with its safety

24   characteristics."  *Id.* at 567 n.4.  "[I]f the expectations of the

25   product's limited group of ordinary consumers are beyond the lay

26   experience common to all jurors, expert testimony on the limited

27   subject of what the product's actual consumers do expect may be

28   proper."  *Id.*

1    Piexon contends that there is no evidence that any alleged

2  design defect of the JPX caused Hernandez's injury.  As an initial

3  matter, the City's arguments regarding design defect, as opposed to

4  manufacturing defect, do not identify any particular defect.  The

5  City's only contention is that "the velocity of the JPX Jet

6  Protector is the problem."  (Opp. at 10:15.)  The City's position,

7  unsupported by any citation to case law or other authority, centers

8  on the facts that JPX is designed to target a subject's face, is

9  unique in the marketplace, and has a higher muzzle velocity than

10  advertised.[8]  (Id.)

11    Based on the evidence presented, the court cannot conclude

12  that the facts permit an inference that consumers may form minimum

13  safety assumptions about JPX devices.  The JPX, which the City

14  itself asserts to be "unique," is not a product with which the

15  general public is likely to have any experience, let alone

16  sufficient experience to form an opinion about minimum safety

17  assumptions.  See id. at 564 (discussing Bates v. John Deere Co.,

18  148 Cal.App.3d 40, 52 (1983) ("We . . . find it difficult to apply

19  the [consumer expectation] test to these facts, in part because it

20  is difficult to conceive that an ordinary consumer would know what

21  to expect concerning the safety design of a commercial cotton

22  picker.")).  The City has not cited any evidence that lay jurors

23  could form such an opinion based upon their own experiences, let

24  alone any expert evidence that would allow jurors to form an

25  opinion about what the universe of law enforcement or other actual

26

27    [8] The City's contention that Piexon encourages point blank

28  deployment at secondary targets is unsupported in the record, as
     explained above.

20

1  consumers of JPX devices might reasonably expect.  <u>Soule</u>, 8 Cal.

2  4th at 567 n.4.  Thus, even if the consumer expectation test were

3  applicable here, there is no triable issue as to whether Plaintiff

4  has satisfied that test.

5                        ii.  Risk-Benefit Test

6       "A product is defective under the risk benefit test if the

7  plaintiff demonstrates that the product's design proximately caused

8  his injury and the defendant fails to establish, in light of the

9  relevant factors, that . . . the benefits of the challenged design

10 outweigh the risk of danger inherent in such design."  <u>Mariscal</u>, 52

11 F.Supp.3d at 987.  Relevant factors include the gravity of the

12 danger posed by the design and the mechanical and economical

13 feasibility of a safer design.  <u>Id.</u>  The plaintiff bears the burden

14 of making a prima facie showing that the injury was caused by the

15 defective design, at which point the burden shifts to the defendant

16 to show that the benefits of the design outweigh the risks.  <u>Id.</u>

17      Although the City's argument is not well developed, it asserts

18 that "the velocity of the JPX Jet Protector is the problem" in

19 light of Piexon's literature that suggests that "short range JPX

20 Jet Protector deployment at the secondary target[']s 'chest, neck,

21 and side of head' can safely be accomplished at close distances."

22 (Opp. at 10:18-20.)  As explained above, that characterization of

23 the Piexon training materials is inaccurate.

24      The City also makes reference to the feasability of utilizing

25 a "Distance Control unit" that Piexon developed to automatically

26 measure the distance to a JPX target and provide a warning signal

27 to the user, but does not support that reference with any citation

28 to the record.  (Opp. at 10.)  In any event, that argument is

1  geared toward the balancing of the relevant risk-benefit factors.

2  That balancing is premature.  The City must first meet its burden

3  to establish a prima facie case that Hernandez's injury was caused

4  by the JPX's defective velocity design.  Mariscal, 52 F.Supp.3d at

5  987.  As discussed above, however, the only evidence pertaining to

6  velocity and causation is the City's expert's opinion that Clark's

7  unit discharged at a higher velocity than advertised.  Even he,

8  however, did not know whether a 180 m/s discharge velocity would

9  cause the same injuries.  On the current record, which includes no

10  medical evidence, no reasonable trier of fact could conclude that

11  the JPX's defective muzzle velocity caused Hernandez's injury.

12      C.   Warranty Claims

13           1.   Express Warranty

14      There is no dispute that the City did not contract with Piexon

15  to purchase the JPX devices.  Generally, "privity of contract is

16  required in action for breach of express warranty and breach of

17  implied warranty."  Tapia v. Davol, 116 F.Supp.3d 1149, 1159 (S.D.

18  Cal. 2015).  An exception to this requirement applies to express

19  warranty claims, however, where a purchaser relies upon

20  representations made by a manufacturer in labels or advertisements.

21  Id.; Fundin v. Chicago Pneumatic Tool Co., 152 Cal. App. 3d 951,

22  957 (1984).

23      The City identifies two supposed express warranties, one

24  regarding "certain muzzle velocities" and the other that "JPX could

25  be safely deployed at close range if targeting the chest, neck or

26  side of the head."  (Opp. at 12.)  As explained above, the latter

27  contention is not supported by the record.  As to "certain muzzle

28  velocities," it is true that certain Piexon training materials

represented that JPX had a muzzle velocity of 180 m/s.  The City
refers only generally to "marketing and product literature,"
without any citation to the record.  (Opp. at 12:4.)  It is unclear
to which documents the City refers specifically.  Even assuming
that the City refers to the training materials, as opposed to
"marketing or product literature," there is no evidence in the
record that any BPD or City official relied upon those
advertisements for any reason.

Absent any evidence of privity between the City and Piexon or
the former's reliance upon the latter's marketing materials, the
City's express warranty claim fails.

### 2.  Implied Warranty

The City does not address Piexon's argument that the lack of
privity is fatal to the City's implied warranty claim.  But unlike
an express warranty claim, an implied warranty claim requires a
showing of privity.  <u>See</u> <u>Tapia</u>, 116 F.Supp.3d at 1159-60.  Although
the City argues, without citation, that it "was relying on Piexon
and Bart Bacolini to provide them with a product and appropriate
training to allow the BPD to use the JPX safely for law enforcement
purposes," it is undisputed that the City never contracted with
Piexon for anything.  <u>See</u> <u>Burr v. Sherwin Williams Co.</u>, 42 Cal.2d
682, 695 (1954) ("The general rule is that . . . there is no
privity between the original seller and a subsequent purchaser who
is in no way a party to the original sale.")  Piexon is entitled to
summary judgment.

### D.  Misrepresentation

Lastly, Piexon argues that the City's misrepresentation claims
fail because Piexon did not have any communications with the City

1    or Clark.  (Mot. at 24.)  The City argues, without citation to

2    authority or the record, that "there are more than enough false

3    claims."  (Opp. at 12.)  Specifically, the City identifies

4    misrepresentations about JPX's muzzle velocity, confusing and

5    negligent training materials, and claims that JPX could safely be

6    shot at the side of the head at close range.  As explained above,

7    the record does not support the latter two assertions.  And, as

8    explained above, there is no evidence that any misrepresentation of

9    muzzle velocity resulted in damages to the City.  See West v.

10   JPMorgan Chase Bank, N.A., 214 Cal. App. 4th 780, 792 (2013)

11   (listing elements of negligent misrepresentation claim).[9]

12   Accordingly, Piexon is entitled to summary judgment.

13   **IV.  Conclusion**

14        For the reasons stated above, Piexon's Motion for Summary

15   Judgment is GRANTED.

16

17   IT IS SO ORDERED.

18

19   Dated: September 30, 2016

20                                        DEAN D. PREGERSON
                                          United States District Judge

21

22

23

24

25   _____

26        [9] The City does not respond to Piexon's argument that the
     misrepresentation claims fail because Piexon never communicated
27   with the City.  A misrepresentation claim may, however, be based
     upon indirect communications if the maker has reason to expect that
28   the terms of the representation will be repeated.  See, e.g. Cadlo
     v. Owens-Illinois, Inc., 125 Cal.App.4th 513, 520 (2004).